# United States Court of Appeals
## For the First Circuit

Nos. 16-1133, 16-1134, 16-1189, 16-1204

THOMAS & BETTS CORPORATION,

Plaintiff/Third-Party Plaintiff, Appellant/Cross-Appellee,

v.

NEW ALBERTSON'S, INC.,

Defendant/Third-Party Plaintiff, Appellee/Cross-Appellee,

ALFA LAVAL INC.; BOSTON RENAISSANCE CHARTER PUBLIC SCHOOL;
BOSTON RENAISSANCE CHARTER SCHOOL, INC.;
SIEMENS INDUSTRY, INC.; ALLIS-CHALMERS ENERGY, INC.;
DAMPNEY COMPANY, INC.,

Third-Party Defendants, Appellees/Cross-Appellants/Cross-
Appellees,

JEANETTE YUKON, as General Partner of Yukon/Hyde Park Avenue
Limited Partnership; JEWEL FOOD STORES, INC.; STAR MARKETS
COMPANY; HYDE PARK MANAGER, INC., as Administrative Trustee for
W/S Cardinal Hyde Park-MA Trust; DAMPNEY COMPANY, INC.,

Third-Party Defendants, Appellees/Cross-Appellees.

Nos. 17-1360, 17-1361

THOMAS & BETTS CORPORATION,

Plaintiff/Third-Party Plaintiff, Appellant/Cross-Appellee,

v.

NEW ALBERTSON'S, INC.,

Defendant/Third-Party Plaintiff, Appellee/Cross-Appellant,

ALFA LAVAL INC.; BOSTON RENAISSANCE CHARTER PUBLIC SCHOOL;
BOSTON RENAISSANCE CHARTER SCHOOL, INC.;
SIEMENS INDUSTRY INC.; ALLIS-CHALMERS ENERGY, INC.;
DAMPNEY COMPANY, INC.,

Third-Party Defendants, Appellees.

———————————

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

———————————

Before

Howard, Chief Judge,
Selya and Barron, Circuit Judges.

———————————

Howard Merten, with whom Paul M. Kessimian, Robert K. Taylor, and Partridge, Snow, & Hahn LLP were on brief for appellant/ cross-appellee.

C. Dylan Sanders, with whom Lisa C. Goodheart and Sugarman, Rogers, Barshak, and Cohen, P.C. were on brief for New Albertson's, Inc.; Jewel Food Stores, Inc.; Star Markets Company, Inc.; and Hyde Park Manager, Inc.

Jonathon C. Burwood, with whom Hinshaw and Culbertson LLP were on brief for Alfa Laval, Inc.

John T. Harding, with whom Lewis, Brisbois, Bisgaard, & Smith LLP were on brief for appellee/cross-appellant Boston Renaissance Charter School, Inc. and Boston Renaissance Charter Public School.

Eric L. Klein, with whom Marc J. Goldstein, Brook Detterman, and Beveridge & Diamond, P.C. were on brief for Siemens Industry, Inc. and Allis-Chalmers Energy, Inc.

A. Neil Hartzell, with whom LeClair Ryan, A Professional Corporation were on brief for Jeanette Yukon.

Carolyn M. Miller, with whom Matthew C. Welnicki and Melick & Porter, P.C. were on brief for Dampney Company, Inc.

———————————

February 6, 2019

———————————

**BARRON**, **Circuit Judge**. In 2007, at the direction of the Massachusetts Department of the Environment ("MassDEP"), an extensive cleanup of Mother Brook, a canal in Boston, Massachusetts, began following its contamination by polychlorinated biphenyls ("PCBs"). The cleanup ultimately resulted in a 2010 lawsuit in which two parties -- Thomas & Betts and New Albertson's -- brought Massachusetts law claims in the United States District Court for the District of Massachusetts against each other and various third parties. The claims, which were primarily brought under § 4 of Chapter 21E, see Mass. Gen. Laws ch. 21E, § 4, sought reimbursement for the money that Thomas & Betts and New Albertson's each had spent on the cleanup.

After a lengthy trial, a jury rendered a special verdict. The jury found, among other things, that Thomas & Betts was "liable to" New Albertson's under § 4 of Chapter 21E for a portion of what are known as the response costs that New Albertson's had incurred in connection with the cleanup of the canal. The jury also found that other parties (but not New Albertson's) were "liable to" Thomas & Betts under § 4 of Chapter 21E for various portions of the response costs that it had incurred in the cleanup. The jury then allocated the percentage of the response costs that each of the various parties were responsible for reimbursing to, respectively, New Albertson's and Thomas & Betts.

The District Court entered judgment based on the jury's special verdict and awarded prejudgment interest, under § 6B or § 6H of Chapter 231, without specifying which applied, to New Albertson's and Thomas & Betts on the funds that had been awarded to each of them on their § 4 claims. The District Court then entered a separate judgment in which it awarded New Albertson's attorney's fees under § 15 of Chapter 21E. The consolidated appeals that are now before us concern both judgments. We affirm each of them.[1]

## I.

To understand the many issues that we need to address, we first provide some background on Chapter 21E and the cleanup of Mother Brook. We then review the travel of the litigation.

## A.

Chapter 21E is the Massachusetts version of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-28. See John S. Boyd Co. v. Boston Gas Co., 992 F.2d 401, 404 n.3 (1st Cir. 1993). The Massachusetts Supreme Judicial Court ("SJC") has explained that Chapter 21E, like its federal analogue, seeks "to compel the prompt

---

[1] One of the appeals, No. 16-1204, has been brought by a party -- Allis-Chalmers Energy, Inc. -- that was not found liable by the jury. The appeal concerns the District Court's denial of that party's motion for summary judgment. In light of our disposition of the other appeals, we dismiss this appeal as moot.

and efficient cleanup of hazardous material and to ensure that costs and damages are borne by the appropriate responsible parties."  Bank v. Thermo Elemental Inc., 888 N.E.2d 897, 911 (Mass. 2008) (quoting Taygeta Corp. v. Varian Assocs., 763 N.E.2d 1053, 1059 (Mass. 2002)).  To that end, whenever the MassDEP "has reason to believe" that "hazardous material has been released" or that there is a "threat" of such a release, it "is authorized to take or arrange for such response actions as it reasonably deems necessary."  Mass. Gen. Laws ch. 21E, § 4.

Section 4 further provides that, when the MassDEP has reason to believe that there has been such a release or the threat of one, it must notify the "owner or operator of the site . . . of its intent to take such action," except under certain circumstances not relevant here.[2]  Id.  Section 4 then provides that "[a]ny person who undertakes a necessary and appropriate response action regarding the release or threat of release of . . . hazardous materials shall be entitled to reimbursement from any other person liable for such release or threat of release for the reasonable costs of such response action."  Id.  And, § 4 provides as well,

_____

[2] Chapter 21E defines a "site" as "any building, structure, installation, equipment, pipe or pipeline, . . . well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or any other place or area where oil or hazardous material has been deposited, stored, disposed of or placed, or otherwise come to be located."  Mass. Gen. Laws ch. 21E, § 2.

"[i]f two or more persons are liable pursuant to section five [of Chapter 21E] for such release or threat of release, each shall be liable to the others for their equitable share of the costs of such response action."  Id.

Section 5(a) in turn spells out the "person[s]" who are "liable" for such release or threat of release and to whom they are "liable."[3]  The "person[s]" who are "liable" pursuant to § 5 for a release or threat of such release include, in relevant part: "the owner or operator of . . . a site from or at which there is or has been a release or threat of release of oil or hazardous material," id. § 5(a)(1); "any person who at the time of storage or disposal of any hazardous material owned or operated any site at or upon which such hazardous material was stored or disposed of and from which there is or has been a release or threat of release of hazardous material," id. § 5(a)(2); and "any person who otherwise caused or is legally responsible for a release or threat of release of oil or hazardous material from a . . . site," id. § 5(a)(5).  A "person" described in § 5(a) is, under § 5(a)(i), "liable . . . to the [C]ommonwealth [of Massachusetts] for all costs of assessment, containment and removal incurred . . .

_____

[3] Chapter 21E defines a "release" as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing into the environment," save for several exceptions not relevant here.  Mass. Gen. Laws ch. 21E, § 2.

relative to such release or threat of release;" and, under § 5(a)(iv), "liable . . . to any person for any liability that another person is relieved of pursuant to [Mass. Gen. Laws ch. 21E, § 4.]"

These portions of the statute are relatively straightforward. There is, however, one additional point about the statute that is critical to bear in mind in considering the analysis that follows, though it is quite technical. The point is this.

Section 5(b) recognizes that a "person who is liable solely pursuant to [§ 5(a)(1)]" -- a so-called "current owner" -- is "liable to" other current owners and is "liable to" the Commonwealth. Id. § 5(b). But, § 5(b) provides that such a current owner in some circumstances may not be "liable to" any other "person[s]" who are described in § 5(a). Specifically, § 5(b) provides that a current owner is not "liable to" any "person who is liable pursuant to" §§ 5(a)(2)-(5), if the current owner can show that (1) it "did not own or operate the site at the time of the release or threat of release in question" and (2) it "did not cause or contribute to such release or threat of release." Id.

The upshot of this limitation in § 5(b) -- by virtue of how §§ 5(a)(1) and 5(b) interact both with each other and with § 4 -- is the following. A "person" may be "liable" within the

- 7 -

meaning of § 5 -- for example, by virtue of being "liable to the [C]ommonwealth" under § 5(a)(1), in consequence of owning a site from which there "has been a release" -- and yet not be "liable to" a "person" who seeks reimbursement under § 4 for the costs that it incurred in connection with a response action that it undertook in consequence of that release.  Id.  And, as we will see, this limitation on liability in § 4, arising from § 5(b), bears directly on a number of the issues that we must address in these appeals.

There is one final statutory provision that warrants much briefer mention.  Section 4A of Chapter 21E creates a cause of action premised on the liability that § 4 imposes.  It provides that parties may seek reimbursement from other parties, based on their liability under § 4, for the costs that they have incurred in undertaking response actions.  Specifically, § 4A provides that "any person who has given notice pursuant to this section may commence a civil action in the superior court department of the trial court seeking from the notice recipient contribution, reimbursement or an equitable share of the costs of such response action or of such actual or potential liability."  Id. § 4A.[4]

---

[4] The District Court ruled that Thomas & Betts was excused from complying with the notice requirement in § 4A because the Chapter 21E claims under § 4 that Thomas & Betts brought were either cross-claims or third-party claims.  No party appeals that ruling.

There are also certain Massachusetts regulations that are useful to understand. That is because the MassDEP implements Chapter 21E through the Massachusetts Contingency Plan (the "Plan"), 310 Mass. Code Regs. 40. See Mass. Gen. Laws ch. 21E, § 3(b).

The Plan defines a "response action" as the "assessment[], containment[], and/or removal[]" of hazardous materials. 310 Mass. Code Regs. 40.0006(2)(a). The Plan further provides that, in carrying out the authority to arrange for response actions, the MassDEP may issue a "Notice of Responsibility" to a "potentially responsible party" or a "responsible party." Id. at 40.0160(1); see also Mass. Gen. Laws ch. 21E, § 9 (describing MassDEP's authority to order a responsible party to undertake a response action). The Plan defines a "potentially responsible party" as "a person who is potentially liable pursuant to [Chapter 21E]." 310 Mass. Code Regs. 40.0006(12). The Plan defines a "responsible party," by contrast, as "a person who is liable under [Chapter 21E]." Id.

---

We note that, while § 4 imposes liability on certain persons to reimburse the response costs that a "potentially responsible party" incurs, § 5(a)(iii) separately makes a "person" described in §§ 5(a)(1)-(5) "liable to . . . any person for damage to . . . real or personal property incurred or suffered as a result of such release or threat of release." Mass. Gen. Laws ch. 21E, § 5(a); see also Martignetti v. Haigh-Farr Inc., 680 N.E.2d 1131, 1135-36 (Mass. 1997). No party to this litigation advances such a § 5 claim, however. The claims at issue -- insofar as they are brought pursuant to Chapter 21E -- are all brought under § 4.

The MassDEP has the "sole discretion" to determine "whom to notify of their potential liability under [Chapter 21E]." 310 Mass. Code Regs. 40.0160(1)(a). Once notified by the MassDEP, "potentially responsible parties" may undertake a response action, while "responsible parties" must do so. Id. at 40.0403(1).

**B.**

It is against this dense statutory and regulatory background that the dispute between the parties to these appeals comes to us. The dispute itself has its origins in events that took place nearly two decades ago.

Thomas & Betts is one of the two principal parties to these appeals. In 1999, it acquired a company that owned a property upstream from Mother Brook. Thomas & Betts, along with the other parties to these appeals, has stipulated that the company that it had acquired had used and stored PCBs on its property while it conducted industrial operations there.

New Albertson's is the other principal party to these appeals. It has stipulated, along with the other parties, that it "stands in the shoes" of a number of parties that had leased a property downstream from Thomas & Betts's property, that this downstream property had long been home to a supermarket, and that New Albertson's had indemnified the owner of the supermarket property against certain environmental costs and responsibilities.

- 10 -

In 2000, sediment samples from the upstream property that Thomas & Betts owned tested positive for PCBs. The next year, Thomas & Betts developed and began carrying out a remediation plan for that property as well as for Mother Brook in its entirety.

On October 17, 2007, the MassDEP sent an email to Thomas & Betts, as the owner of the upstream property, and to the owner at that time of the downstream supermarket property. The email reported that the MassDEP had found PCB contamination along both banks of Mother Brook in the area adjacent to the supermarket property and potentially extending downstream to the canal's terminus at the Neponset River. The email also indicated that, pursuant to § 4 of Chapter 21E, the MassDEP would be issuing a Notice of Responsibility both to Thomas & Betts and to the owner of the supermarket property in connection with the contamination of Mother Brook.

The next month, the MassDEP issued the Notice of Responsibility. The Notice of Responsibility stated that the MassDEP had reason to believe that Thomas & Betts and the owner of the supermarket property were "Potentially Responsible Parties." The Notice of Responsibility also stated that "responsible parties" must take necessary response actions or risk "liab[ility] for up to three (3) times all response costs incurred by [the] MassDEP." See Mass. Gen. Laws ch. 21E, §§ 5(e), 9; 310 Mass. Code Regs. 40.1220(5). Finally, the Notice of Responsibility stated

- 11 -

that "[t]he subject site shall not be deemed to have all the necessary and required response actions taken unless and until all substantial hazards presented by the site have been eliminated and a level of No Significant Risk exists."[5]

In response to the email from the MassDEP, but before the MassDEP had sent the Notice of Responsibility, Thomas & Betts and New Albertson's entered into a joint remediation agreement. Specifically, the two parties agreed "to cooperate with each other in good faith and with due haste to implement the [MassDEP's] expectations set forth in . . . the October 17 Email." Pursuant to that same agreement, Thomas & Betts and New Albertson's also agreed to an "interim" allocation of the costs that they would jointly incur in cleaning up Mother Brook. Thomas & Betts and New Albertson's did so on the understanding that this interim allocation was "not intended to reflect the parties' ultimate cost responsibility."

At the time that Thomas & Betts entered into the joint remediation agreement with New Albertson's, Thomas & Betts already had the necessary permits and authorizations to remediate Mother Brook. Thus, Thomas & Betts and New Albertson's agreed to

_____

[5] A Massachusetts regulation promulgated by the MassDEP defines "No Significant Risk" as a "level of control of each identified substance of concern at a site . . . such that no such substance of concern shall present a significant risk of harm to health, safety, public welfare or the environment during any foreseeable period of time." 310 Mass. Code Regs. 40.0006(12).

undertake their joint remediation effort pursuant to those permits and authorizations.

To clean up Mother Brook, the canal had to be drained and the contaminated sediment completely removed. The portion of Mother Brook adjacent to the supermarket property was bounded by two parallel bridges that spanned the canal. To drain and excavate this portion of the canal, access to either the north bank, where the supermarket property was located, or the south bank, was needed.

The cleanup of Mother Brook was completed by December of 2009. In the end, Thomas & Betts incurred $12,703,322.52 in response costs. Pursuant to the joint remediation agreement, New Albertson's paid Thomas & Betts $2,924,306.88. New Albertson's itself incurred an additional $791,398.31 in response costs in connection with the cleanup.

## C.

In November of 2010, Thomas & Betts filed a complaint, invoking federal diversity jurisdiction, against New Albertson's in the United States District Court for the District of Massachusetts. See 28 U.S.C. § 1332(a). Thomas & Betts alleged that New Albertson's had ceased paying it pursuant to the agreement to allocate the costs of the cleanup set forth in the joint remediation agreement. On that basis, Thomas & Betts asserted claims against New Albertson's under Massachusetts law for breach

- 13 -

of contract, breach of the covenant of good faith, and unfair and deceptive business practices.

In January of 2011, New Albertson's filed counterclaims against Thomas & Betts under Massachusetts law for breach of contract, breach of the covenant of good faith, and unfair and deceptive business practices. New Albertson's also asserted a counterclaim against Thomas & Betts for reimbursement based on § 4 of Chapter 21E for all the response costs that it had incurred in connection with the cleanup of Mother Brook and for costs, including attorney's fees, under § 15 of Chapter 21E.

Later that year, Thomas & Betts responded by filing its own counterclaims based on § 4 of Chapter 21E against New Albertson's for reimbursement for the response costs that it had incurred in connection with the cleanup and for costs, including attorney's fees, under § 15 of Chapter 21E. Thomas & Betts also added a new breach of contract counterclaim under Massachusetts law against New Albertson's. This counterclaim alleged that New Albertson's had breached the joint remediation agreement's duty "to cooperate in good faith" by, among other things, "[r]efusing to allow timely access to New Albertson's' property, which access was necessary to complete the bank remediation work."

Eventually, Thomas & Betts and New Albertson's each also filed complaints pursuant to § 4A of Chapter 21E against other parties. Those third-party complaints sought reimbursement from

the third parties for the response costs that Thomas & Betts and New Albertson's, respectively, each had incurred in remediating the contamination of Mother Brook.

One of these third-party defendants is Alfa Laval Inc., which is also a party on appeal. Alfa Laval manufactured centrifuges on the south bank of Mother Brook, across from where the supermarket property is located, from the 1960s until the late 1970s. Alfa Laval purchased the site and assets of the centrifuge business from another manufacturer that, the parties to these appeals have stipulated, used and stored PCBs at this south bank property.

Another set of third-party defendants who are parties on appeal includes the Boston Renaissance Foundation, Inc. ("Foundation"), which purchased the south bank property in 2008, and the Boston Renaissance Charter Public School, which leased that same property from the Foundation. We will refer to these parties collectively as "the Charter School Parties." The Charter School Parties were joined as defendants in this litigation by Thomas & Betts in late 2011. Thomas & Betts claimed that the Charter School Parties were "liable to" it, under § 4 of Chapter 21E, for the reimbursement of a portion of the response costs that it had incurred.

Finally, we need to mention one other pair of parties to these appeals. These parties are Dampney Company, Inc. ("Dampney")

and Jeanette Yukon, as general partner of Yukon/Hyde Park Avenue Limited Partnership ("Yukon"). Dampney was a paint manufacturer that owned a site just north of Thomas & Betts's property between 1930 and 1970.

Thomas & Betts filed a third-party complaint against Dampney under § 4A of Chapter 21E in December of 2011. The Yukon/Hyde Park Avenue Limited Partnership at one point owned the south bank property where the Boston Renaissance Charter Public School is now located. Yukon became a party to the suit due to the third-party complaint that Alfa Laval filed pursuant to § 4A of Chapter 21E in 2012. Neither Dampney nor Yukon claim that the District Court erred, and we need only mention them briefly at points in considering the challenges that Thomas & Betts brings on appeal.

The trial on these various claims took place in late 2015 and lasted twenty-one days. Only the claims based on § 4 of Chapter 21E for reimbursement by Thomas & Betts and New Albertson's -- against each other and the other parties that we have mentioned -- went to the jury.

On December 22, 2015, the jury returned a special verdict. The first part of the special verdict addressed "Question One" on the special verdict form, which concerned the claims that Thomas & Betts had brought based on § 4 of Chapter 21E. Specifically, the jury found that Thomas & Betts had incurred

$12,703,322.52 in reasonable and necessary response costs. The jury also found that Alfa Laval and the Charter School Parties were "liable to" Thomas & Betts for a portion of the response costs that had been incurred by Thomas & Betts. The jury then allocated responsibility for 14 percent of those response costs to Alfa Laval and 1 percent of them to the Charter School Parties. The jury found that no other party to the litigation, including New Albertson's, was "liable to" Thomas & Betts for any portion of Thomas & Betts's response costs. The jury assigned Thomas & Betts the other 85 percent of the response costs.

The second part of the special verdict addressed "Question Two," which concerned the claims that New Albertson's had brought based on § 4 of Chapter 21E. The jury found that New Albertson's had incurred $791,398.31 in reasonable and necessary response costs. The jury also found that Thomas & Betts was "liable to" New Albertson's for 75 percent of those response costs and that no other party to the litigation was "liable to" New Albertson's for them. The jury assigned New Albertson's the other 25 percent of the response costs. In addition, the jury found that New Albertson's did not "cause[] or contribute[] to the release of PCBs to the banks or streamed of Middle or Lower Mother Brook[.]"

The District Court entered judgment based on the jury's special verdict on December 31, 2015. The various parties then

filed a number of post-trial motions, including motions to alter the judgment. The District Court denied most of these motions on March 29, 2016, although the District Court did grant motions by Thomas & Betts and New Albertson's to alter the judgment and to include prejudgment interest on the funds that each had been awarded pursuant to their respective claims under § 4 of Chapter 21E. The District Court did so pursuant to either § 6B or § 6H of Chapter 231, without specifying which provision applied. On May 2, 2016, the District Court issued a written decision explaining both its prejudgment interest rulings and its ruling rejecting Thomas & Betts's post-trial motion for a new trial. A number of parties appealed from the District Court's amended judgment.[6]

The District Court then issued two written decisions -- the first on September 29, 2016 and the second on March 10, 2017 -- on still-pending motions concerning costs, including attorney's and expert's fees. The District Court finally entered judgment on the motions for attorney's fees on April 4,

---

[6] The judgment initially entered pursuant to the verdict did not address the roughly $2.9 million that New Albertson's paid Thomas & Betts pursuant to the joint remediation agreement. Both New Albertson's and Thomas & Betts moved to amend the judgment. The District Court granted the motions.

The District Court's judgment on the verdict, as amended, was a final and appealable decision prior to its later order on attorney's fees, which is separately appealable. See Budinich v. Becton Dickinson & Co., 486 U.S. 196, 200-03 (1988). Thomas & Betts appealed in No. 16-1189. Alfa Laval appealed in No. 16-1133. The Charter School Parties appealed in No. 16-1134.

2017.  In the portion of the judgment on those costs that is at issue on appeal, the District Court ordered Thomas & Betts to pay $1,747,188.59 in costs, including attorney's and expert's fees, to New Albertson's under § 15 of Chapter 21E.

Thomas & Betts then appealed this judgment in No. 17-1360, as did New Albertson's in No. 17-1361.  These appeals, along with the others mentioned above, were all then consolidated.

## II.

We begin with the appeal that Thomas & Betts brings from the District Court's denial of its motion for a new trial pursuant to Federal Rule of Civil Procedure 59.  Thomas & Betts contends that the District Court erred in denying its Rule 59 motion based on what it contends were a number of alleged legal errors at trial. These alleged legal errors are: that the District Court reversibly erred by refusing to instruct the jury on one of its breach of contract claims; that the District Court reversibly erred by giving four erroneous instructions concerning the potential liability, under § 4 of Chapter 21E, of other parties to Thomas & Betts for at least some of its response costs; and that the jury rendered inconsistent verdicts on certain of Thomas & Betts's claims under § 4 of Chapter 21E.  We address each asserted error in turn.

## A.

We start with the contention by Thomas & Betts that the District Court committed reversible error by failing to instruct

the jury on its breach of contract claim against New Albertson's for failing to provide access to its property despite its duty under the joint remediation agreement to "cooperate in good faith." We review the District Court's denial of a motion for a new trial for abuse of discretion. Kennedy v. Town of Billerica, 617 F.3d 520, 527 (1st Cir. 2010). Where, however, a motion for a new trial relies on "preserved claims of instructional error, we afford de novo review to 'questions as to whether the jury instructions capture the essence of the applicable law.'" Ira Green, Inc. v. Military Sales & Service Co., 775 F.3d 12, 18 (1st Cir. 2014) (quoting DeCaro v. Hasbro, Inc., 580 F.3d 55, 61 (1st Cir. 2009)).

Here, of course, the claimed instructional error consists of a failure by the District Court to give an instruction on a claim at all rather than of an instruction that was given but that was allegedly wrong. "The district court must give a jury instruction on a material issue if the evidence presented at trial could plausibly support a finding for either side." Id. "The standard for determining whether a factual issue is sufficiently contested to require an instruction is identical to the standard for determining whether a factual controversy prevents the entry of judgment as a matter of law." Wilson v. Mar. Overseas Corp., 150 F.3d 1, 10 (1st Cir. 1998). Thus, to show error here, Thomas & Betts must demonstrate that there is more than "a mere scintilla of evidence" in the record to support the claim on which the jury

was not instructed.  Fashion House, Inc. v. K Mart Corp., 892 F.2d 1076, 1088 (1st Cir. 1989).  Our review of this matter of law is de novo.  See Wilson, 150 F.3d at 10.

Thomas & Betts contends -- as it did below in moving for a new trial -- that the record shows that a jury supportably could have found that, in 2007, and then, again, from 2008 into 2009, New Albertson's breached the duty at issue.  Thomas & Betts further contends that there was enough evidence in the record to permit the jury to have found that the alleged breach -- no matter when it occurred -- resulted in damages.  Accordingly, Thomas & Betts contends that the District Court was obliged to instruct the jury on this claim of contractual breach.

In ruling otherwise in denying Thomas & Betts's motion for new trial, the District Court concluded, among other things, that the record did not contain sufficient evidence for a jury reasonably to find damages resulting from the alleged breach.[7]

---

[7] We note that the District Court, in rejecting the motion by Thomas & Betts for a new trial concerning this instruction, explained that "the [joint remediation] [a]greement does nothing more than codify the signatories' duties under Chapter 21E and provide for certain interim payments from New Albertson's to Thomas & Betts."  Thomas & Betts does not argue that, insofar as this conclusion regarding codification formed the basis for the District Court's rejection of its motion for new trial as to this instruction, this conclusion was error.  And, even assuming error on this score, it was harmless, as, for the reasons that we explain, Thomas & Betts cannot show that it put forth enough evidence to permit a jury to find that New Albertson's breached the duty "to cooperate in good faith" that the joint remediation agreement establishes.

But, as "[w]e are at liberty to affirm a district court's judgment on any ground made manifest by the record," United States v. George, 886 F.3d 31, 39 (1st Cir. 2018), we may affirm the District Court based on our resolution of the antecedent question of whether the evidence sufficed to support a finding that New Albertson's had committed the alleged breach at all. And, because we conclude that the evidence did not suffice in that regard, we reject the challenge that Thomas & Betts brings concerning the District Court's failure to give this instruction.

## 1.

To make the case that the District Court erred by not instructing the jury on the breach of contract claim, Thomas & Betts first argues that a jury supportably could have found that New Albertson's breached the contractual duty at issue by rejecting a proposal to conduct simultaneous remediation in 2007. Thomas & Betts points to the testimony of John Mitchell, the project manager for Shaw Environmental & Infrastructure, Inc., which was the outside consultant retained by Thomas & Betts for the remediation project.

Mitchell's testimony concerned a 2007 proposal -- never implemented -- that New Albertson's remediate both banks of Mother Brook and its streambed simultaneously. Citing only to this testimony, Thomas & Betts contends on appeal that "the jury heard that [New Albertson's] insisted that the North Bank (its side) be

done first." Thomas & Betts then contends, on that basis, that a jury supportably could find that New Albertson's unreasonably stood in the way of this proposal being put into operation. Accordingly, Thomas & Betts contends, for this reason alone the record adequately supports a finding that New Albertson's breached its duty under the remediation agreement to cooperate in good faith.

The problem with this contention, however, is that Mitchell testified that he did not know who had decided to reject the simultaneous remediation proposal or how the decision not to pursue it had been made. Moreover, Thomas & Betts points to no other evidence to support its contention that New Albertson's unreasonably stood in the way of the 2007 proposal. We thus see no basis for concluding that a jury could find that New Albertson's unreasonably rejected the 2007 proposal. Accordingly, we do not see any basis for concluding that a jury supportably could have found a breach of the duty at issue -- the duty under the joint remediation agreement "to cooperate in good faith" -- based on the evidence concerning that proposal. After all, a jury cannot be asked to rely on "mere speculation and conjecture[,]" see Mullins v. Pine Manor Coll., 449 N.E.2d 331, 338 (Mass. 1983) (quoting Int'l Fidelity Ins. Co. v. Wilson, 443 N.E.2d 1308, 1313 (Mass. 1983)), and, under Massachusetts law, "[t]here is a presumption that all parties act in good faith, and the plaintiff bears the

burden of presenting evidence of bad faith or an absence of good faith." T.W. Nickerson, Inc. v. Fleet Nat. Bank, 924 N.E.2d 696, 706 (Mass. 2010).

**2.**

Thomas & Betts alternatively contends that the District Court erred in not instructing the jury on this breach of contract claim because of evidence about actions that New Albertson's took from 2008 to 2009. Thomas & Betts contends that the evidence of these actions suffices to support a jury finding that the duty at issue was breached. Again, though, we do not agree.

Thomas & Betts points to the fact that the record supportably shows that, during this time, New Albertson's failed to offer Thomas & Betts access to Mother Brook through its property via the north bank of the canal despite knowing that Thomas & Betts had no other available means of accessing the canal. But, as we have noted, under Massachusetts law, we "presum[e] that all parties act in good faith" and that "the plaintiff bears the burden of presenting evidence of bad faith or an absence of good faith[.]" Id. Thus, we do not see how evidence of New Albertson's failure to offer access in and of itself could suffice to support a finding that that New Albertson's breached its contractual duty under the joint remediation agreement "to cooperate in good faith." Nor does Thomas & Betts identify any authority to support a conclusion that such evidence could suffice.

- 24 -

Thomas & Betts does point to an email exchange from June of 2009 in which Thomas & Betts asked a representative of New Albertson's for north bank access and the representative from New Albertson's turned down the request. This exchange does show that, after conferring on the matter with other parties tied to the downstream supermarket property, the New Albertson's representative responded. The record shows that he stated that "we continue to see a number of serious obstacles associated with the idea of using the north bank for access" and that "our shared position at this point is to press the [south bank property owner] to comply with its existing access obligations."

But, evidence that New Albertson's rejected a request for access and gave its reasons for doing so is not in and of itself evidence that New Albertson's breached its duty "to cooperate in good faith." And the effort by Thomas & Betts to supply what is missing by pointing to other evidence fails.

Thomas & Betts points in particular to Mitchell's testimony that, once New Albertson's granted access to the north bank three months later in 2009, workers did not encounter any "obstacles." But, the fact that Mitchell did not report any obstacles once New Albertson's did provide access in September of 2009 reveals nothing about whether New Albertson's had a reasonable basis for concluding that there were serious obstacles to providing such access three months earlier, in June. Moreover, Thomas &

Betts points to nothing in the record that indicates that it challenged the representation that New Albertson's made regarding the serious nature of those obstacles at the time that New Albertson's made it. In fact, Thomas & Betts does not even identify what it believes the record shows that those "obstacles" were or on what basis a jury could find -- despite the absence of any record evidence indicating what those obstacles were -- that the representation made by New Albertson's about the seriousness of them was not made in good faith or was otherwise unreasonable.

Thus, the evidence of the exchange reflected in the email does not suffice to support the finding of breach that Thomas & Betts alleges. Accordingly, we reject this aspect, too, of the challenge that Thomas & Betts brings to the District Court's failure to give the instruction on this breach of contract claim.

**B.**

Thomas & Betts next turns its attention away from the omitted instruction concerning the breach of contract claim to focus on four instructions that the District Court did give but that Thomas & Betts contends were erroneous. These instructions concerned the claims that had been brought by Thomas & Betts pursuant to § 4A of Chapter 21E against New Albertson's and various of the other parties to these appeals for reimbursement, based on § 4 of Chapter 21E, of the response costs that Thomas & Betts had incurred. We conclude, however, that the challenges to these

instructions provide no basis for finding that the District Court erred in denying the motion for new trial.

**1.**

"An erroneous jury instruction warrants a new trial if 'the preserved error, based on a review of the entire record, can fairly be said to have prejudiced the objecting party.'" Goodman v. Bowdoin Coll., 380 F.3d 33, 47 (1st Cir. 2004) (quoting Levinsky's, Inc. v. Wal-Mart Stores, Inc., 127 F.3d 122, 135 (1st Cir. 1997)). We review de novo "whether [each] charge in its entirety -- and in the context of the evidence -- presented the relevant issues to the jury fairly and adequately." Id. Any preserved challenge to an instruction's "matter of form or wording," however, is reviewed only for an abuse of discretion. Id.

Even if a jury instruction is erroneous, it must still cause prejudice to constitute reversible error.[8] And, to be prejudicial, the error must "adversely affect[] the jury verdict and the 'substantial rights' of the objecting party." Davignon v. Clemmey, 322 F.3d 1, 9 (1st Cir. 2003); see also Costa-Urena v.

---

[8] "Because the standard of review is a procedural matter, not a substantive one, we are bound by federal law" in determining whether an erroneous jury instruction constitutes reversible error. Alison H. v. Byard, 163 F.3d 2, 4 (1st Cir. 1998); but see Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 416 (1996) (applying state law where the state's "objective" in using a different standard of review was "manifestly substantive").

<u>Segarra</u>, 590 F.3d 18, 24 n.2 (1st Cir. 2009) ("This 'harmless error' standard applies where . . . a party has properly objected to the court's instruction at trial.").

Finally, we note that to obtain the benefit of the standards of review described above, a party must preserve the challenge to instructional error.  If the challenge is unpreserved, however, it may be either forfeited or waived.  A right is waived by its intentional relinquishment.  <u>Dávila</u> v. <u>Corporación De P.R. Para La Difusión Pública</u>, 498 F.3d 9, 15 n.2 (1st Cir. 2007).  Waived claims are generally not reviewable on appeal.  <u>See</u> <u>Ji</u> v. <u>Bose Corp.</u>, 626 F.3d 116, 129 (1st Cir. 2010) (deeming an issue waived and denying review).  A forfeited claim, by contrast, may be reviewed, but ordinarily only for plain error.  <u>See</u> <u>Sony BMG Music Entm't</u> v. <u>Tenenbaum</u>, 660 F.3d 487, 503 (1st Cir. 2011).

To prevail on plain error review, the party claiming error must show "(1) that there was error, (2) that it was plain, (3) that it likely altered the outcome, and (4) that it was sufficiently fundamental to threaten the fairness, integrity or public reputation of the judicial proceedings." <u>Id.</u>  This standard is high, and "it is rare indeed for a panel to find plain error in a civil case." <u>Id.</u> (quoting <u>Diaz-Fonseca</u> v. <u>Puerto Rico</u>, 451 F.3d 13, 36 (1st Cir. 2006)).

**2.**

Thomas & Betts first contends that the District Court erred in instructing the jury about an affirmative defense -- for lack of knowledge -- that New Albertson's, Yukon, and the Charter School Parties would each have to the claims by Thomas & Betts for reimbursement under § 4 of Chapter 21E of the response costs that Thomas & Betts had incurred. The instruction stated that the defense would be available to any of those parties if, as an owner of a site at which there is or has been a release or threat of release of hazardous material, see Mass. Gen. Laws ch. 21E, § 5(a)(1), that owner could prove that it "didn't know anything" about the release or threatened release of that material.

In giving the instruction, the District Court emphasized: "But [the owners of the site have] got to prove it. They've got to prove it. Thomas & Betts doesn't have to prove it."

Thomas & Betts contends that the instruction "erroneously and confusingly conflated the question of whether a current owner 'caused or contributed' to a release with the question of whether the current owner had knowledge of PCB contamination." And, on that basis, Thomas & Betts now argues that the instruction, insofar as it was erroneous in stating that lack of knowledge could be a defense, was also prejudicial. And, further, Thomas & Betts contends, that is so notwithstanding the

jury's finding that New Albertson's did not "cause[] or contribute[] to the release of PCBs to the banks or streamed of Middle or Lower Mother Brook[.]"

The prejudice argument that Thomas & Betts advances proceeds as follows. Thomas & Betts first asserts that the liability of New Albertson's to Thomas & Betts under § 4 could be based on New Albertson's being found liable under § 5(a)(1), as the "owner or operator of . . . a site from or at which there is or has been a release or threat of release" of PCBs. Thomas & Betts then contends that New Albertson's, if it were found liable under § 5(a)(1), could avoid being found "liable to" Thomas & Betts under § 4 for a proportionate share of the response costs that Thomas & Betts incurred in cleaning up Mother Brook only if the jury also found that, per § 5(b), New Albertson's did not "cause or contribute" to the release or threat of release of PCBs into that canal.

Thus, Thomas & Betts suggests, if the instruction mistakenly conflated causation and knowledge, it could potentially have led the jury to conclude that lack of knowledge on the part of New Albertson's -- in and of itself -- required a finding that New Albertson's did not "cause or contribute" to the release. And, hence, New Albertson's thereby could wrongly escape liability to Thomas & Betts, even if the record could have -- save for the mistaken instruction conflating knowledge and

causation -- permitted the jury to have found that New Albertson's did, in fact, "cause or contribute" to the release.

But, Thomas & Betts did not argue below that the instruction was problematic because it conflated the concepts of causation and knowledge in the way that Thomas & Betts now contends that the instruction conflated them. At most, Thomas & Betts argued below that the instruction was problematic simply because it permitted a lack of knowledge defense at all under § 4, such that, even if a jury found that a party was "liable" under § 5(a)(1) and had "caused or contributed to a release" under § 5(b), that party could escape liability under § 4 for an equitable share of another party's response costs because that party did not know that it had "caused or contributed to the release."

Accordingly, Thomas & Betts's new argument is forfeited, if not waived. And, as Thomas & Betts makes no argument on appeal that it can satisfy the demanding plain error standard that therefore applies to its new argument, this aspect of Thomas & Betts's challenge to the instruction necessarily fails. See Sony BMG Music Entm't, 660 F.3d at 503.

To be sure, Thomas & Betts appears on appeal also to reprise its argument below that the instruction was wrong because it indicated that lack of knowledge is, generally, a defense to liability under § 4, even if the instruction did not thereby

- 31 -

conflate knowledge and causation. But, this aspect of its challenge to the instruction fails on prejudice grounds. And it does so even if we assume that the instruction erroneously stated that a current owner's lack of knowledge of a release or threat of release necessarily precludes that current owner from being found liable for "caus[ing] or contribut[ing]" to a release or threat of release.

Thomas & Betts contends otherwise with respect to prejudice as follows. But for the instruction about the lack of knowledge defense, the jury could have found both New Albertson's and the Charter School Parties "liable to" it under § 4 of Chapter 21E for at least some of its response costs based on the evidence that New Albertson's and the Charter School Parties each "hired contractors who failed to properly or adequately test for PCBs in spite of the known industrial history of the properties that pointed towards PCB contamination."

As this description of Thomas & Betts's argument for showing prejudice reveals, however, Thomas & Betts does not develop any argument as to prejudice with respect to its claim under § 4 against Yukon. Thus, the asserted instructional error has no bearing on Thomas & Betts's appeal of the ruling below as to that claim.

With respect to the Charter School Parties, moreover, Thomas & Betts obviously cannot make a showing of prejudice

concerning this instruction, even assuming that it was erroneous. The jury found that the Charter School Parties were "liable to" Thomas & Betts for the response costs that it had incurred.

That leaves, then, only the issue of prejudice as to the § 4 claim that Thomas & Betts brings against New Albertson's. But, the jury found, as reflected in the special verdict form, that New Albertson's did not "cause[] or contribute[] to the release of PCBs to the banks or streamed of Middle or Lower Mother Brook[.]" And Thomas & Betts makes no argument to us -- aside from an unpreserved contention that the instruction conflated knowledge and causation -- as to how the instruction concerning the lack of knowledge could have impacted that finding. Thus, we see no basis for concluding that the instruction wrongly led the jury to find -- per § 5(b)'s limitation on § 5(a)(1) -- that New Albertson's was not liable to Thomas & Betts under § 4 for reimbursement of an equitable portion of its response costs. Thus, the challenge to the instruction fails on prejudice grounds.[9]

---

[9] We note that Thomas & Betts also develops no argument that the failure on the part of the contractors for New Albertson's to test, in and of itself, could suffice to show liability under § 5(a)(5), which provides that "any person who otherwise caused or is legally responsible for a release or threat of release" is liable to both the Commonwealth and to parties seeking reimbursement under § 4 of Chapter 21E.

- 33 -

Thomas & Betts next focuses on an instruction that the District Court gave to the jury in response to a question that it had asked after deliberations had begun. The District Court initially instructed the jury that: "[T]he law imposes on New Albertson's and the Charter School [Parties] the duty of giving Thomas & Betts reasonable access to the area so they can clean it up. And if they do not give reasonable access to the area, well, then they're liable for contribution anyway." During deliberations, the jury asked for clarification: "If no PCBs were released from a property[,] are the property owners, operators, [and] tenants, still required to provide reasonable access for cleaning up another contaminated property?"

The District Court gave the following response:

> The short answer is "No." . . . As to current owners the statute imposes liability for a release or a continued release while they own it, and the business about reasonable access is if you are otherwise liable because of a release and then you don't provide reasonable access, then you may take that into account with respect to the contribution.

Thomas & Betts contends that the District Court's answer to the jury's question conflicted with § 5(a)(5) of Chapter 21E. That provision makes any "person" liable both to the Commonwealth and to a "person" seeking reimbursement under § 4 if that "person" "otherwise caused or is legally responsible for a release or threat

of release of oil or hazardous material from a vessel or site."
Mass. Gen. Laws ch. 21E, § 5(a)(5).[10]

By answering "no" to the jury's question, Thomas & Betts contends, the District Court's instruction mistakenly precluded the jury from finding that New Albertson's "caused or [was] legally responsible for a release or threat of release" under § 5(a)(5), even if the jury found that New Albertson's denied Thomas & Betts reasonable access to Mother Brook. Thomas & Betts contends that the District Court's "No" answer amounted to an erroneous instruction to the jury that it could not find New Albertson's liable to Thomas & Betts under § 4, per § 5(a)(5), in consequence of having denied reasonable access, if the jury also found that New Albertson's was not "otherwise liable" for a release.

Thomas & Betts contends, moreover, that this instruction was not only wrong, but prejudicial. With respect to prejudice, Thomas & Betts argues, this instructional error foreclosed a

---

[10] We note that it appears that Thomas & Betts means also to contend that this instruction conflicts with § 5(a)(1) of Chapter 21E. That provision concerns a party's liability for a "release" or "threat of release" when it occurs "from or at" the property belonging to that party. Thomas & Betts appears to contend on appeal that the instruction was problematic because it referred only to a "release" and did not refer also to a "threat of release." But, Thomas & Betts's own account to us of what transpired below does not indicate that it objected below to the District Court's instruction on that basis. Nor does Thomas & Betts make any argument that it can satisfy the plain error standard. See, e.g., United States v. Edelkind, 467 F.3d 791, 797 (1st Cir. 2006); United States v. González-Mercado, 402 F.3d 294, 301-02 (1st Cir. 2005).

supportable basis on which the jury could have found New Albertson's "liable" under § 5(a)(5).  That supportable basis was that New Albertson's "caused or was legally responsible for a release" because it denied Thomas & Betts reasonable access to Mother Brook.  Thus, Thomas & Betts contends, the erroneous instruction in this way wrongly prevented the jury from finding that Thomas & Betts was entitled to be reimbursed for response costs by New Albertson's under § 4.

But, even if we assume that Thomas & Betts is right that the instruction was mistaken for the reasons that Thomas & Betts gives, the record does not support a finding of prejudice.  See Figueroa v. Aponte-Roque, 864 F.2d 947, 951 (1st Cir. 1989).  And so, for this reason, the challenge fails.

In this regard, we note that, as we have already explained in connection with the challenge that Thomas & Betts brings to the District Court's failure to have given the breach of contract instruction, none of the evidence that Thomas & Betts identifies concerning New Albertson's failure to make access to its property available in 2007, 2008, or 2009 suffices to permit a jury to find that New Albertson's unreasonably denied Thomas & Betts such access.  For that reason, we concluded that none of that evidence sufficed to support a finding that New Albertson's

- 36 -

thereby breached the duty to cooperate in good faith that the joint remediation agreement imposed.

At most, then, the evidence that Thomas & Betts relies on to show prejudice supportably shows only that New Albertson's failed to provide access, not that it failed to provide reasonable access. Accordingly, we do not see how, even if the instruction erred in describing § 5(a)(5) to preclude a finding of liability based on a denial of reasonable access simply because the party denying such access "was not otherwise liable" for a release of PCBs, Thomas & Betts was harmed by that error.

**4.**

The next instruction that Thomas & Betts challenges concerns the approximately $2.9 million that New Albertson's paid Thomas & Betts pursuant to the joint remediation agreement. The parties stipulated that this nearly $2.9 million amount constituted an interim payment to Thomas & Betts pursuant to the joint remediation agreement for the response costs that Thomas & Betts had incurred.

Consistent with that stipulation, the District Court, while instructing the jury regarding the approximately $12.7 million in response costs incurred by Thomas & Betts, told the jury:

> Let me pause for a moment and say, because I
> think it will occur to you, but what about the
> 2.9 million that it's undisputed New

Albertsons has already paid to Thomas & Betts? The way we've worked that out is I'm taking care of that. It's undisputed as to that. If when all the things you find it turns out that New Albertsons owes more money than that to Thomas & Betts, whatever that amount is, I'm going to subtract the 2.9 million from that. If when the dust settles it's less than that, I'm going to have Thomas & Betts reimburse New Albertsons for that amount of money.

Thomas & Betts did not object to this instruction at the time that it was given. Our review, therefore, is only for plain error. Sony BMG Music Entm't, 660 F.3d at 503. Thomas & Betts makes no argument, however, as to how it can satisfy that high bar. This failure alone dictates that Thomas & Betts must lose on this issue. See, e.g., Edelkind, 467 F.3d at 797; González-Mercado, 402 F.3d at 301-02.

Moreover, Thomas & Betts could not prevail even if it had properly preserved this challenge. Thomas & Betts contends that the wording of the instruction created "confusion." Thomas & Betts points out that the verdict form asked the jury to apportion response costs between Thomas & Betts and New Albertson's with respect to two seemingly distinct pools of money. Thomas & Betts notes in this regard that Question One on the special verdict form asked the jury about the $12.7 million in response costs that Thomas & Betts had incurred, while Question Two on the special verdict form asked the jury about the $790,000 in response costs that New Albertson's had incurred. According to Thomas & Betts,

however, the District Court's instruction did not make clear whether the roughly $2.9 million that New Albertson's had paid to Thomas & Betts under the joint remediation agreement was to be considered as part of the pool of money referenced in Question One or as part of the pool of money referenced in Question Two.

But, as this challenge to the instruction concerns only its wording, our review would be for an abuse of discretion even if it were not forfeited. Mejías-Aguayo v. Doreste-Rodríguez, 863 F.3d 50, 57 n.5 (1st Cir. 2017). The question thus would be "whether the jury instructions as a whole 'adequately explained the law or whether they tended to confuse or mislead the jury on controlling issues.'" McDonald v. Town of Brookline, 863 F.3d 57, 65 (1st Cir. 2017) (quoting Federico v. Order of Saint Benedict in R.I., 64 F.3d 1, 4 (1st Cir. 1995)).

When considered in the context of the instructions as a whole, and given the discretion that we afford district courts to choose the wording of their instructions, the instruction sufficed to make clear that the roughly $2.9 million should be considered part of the $12.7 million in response costs that Thomas & Betts had incurred. After all, the District Court explained to the jury immediately before giving the instruction that it was undisputed that Thomas & Betts had incurred $12.7 million in response costs; that "of that amount" New Albertson's had paid roughly $2.9 million to Thomas & Betts; and that the jury had to determine which

entities were liable to Thomas & Betts for those costs incurred by Thomas & Betts.  Accordingly, the challenge that Thomas & Betts brings to this instruction is without merit.

**5.**

The last instruction that Thomas & Betts focuses on in challenging the District Court's denial of its motion for new trial states in part that "Thomas & Betts has to prove [the amount of response costs Thomas & Betts incurred] and they have to prove that they incurred costs in performing the response actions.  The response actions here are cleaning up Middle and Lower Mother Brook."  The instruction then goes on to state that Thomas & Betts had to prove "that it was the release of PCBs [by the parties from which Thomas & Betts seeks to recover] is what caused Thomas & Betts to incur the response costs, that is the release of PCBs now on the banks or into the brook itself was a substantial contributing factor in bringing about the response costs."

Thomas & Betts contends that this instruction -- by using the phrase "substantial contributing factor" -- wrongly instructed the jury that the defendants, including Dampney, were entitled to a de minimis defense to being found liable under § 5 of Chapter 21E.  Thus, Thomas & Betts goes on to contend, the jury could have found on that mistaken basis that these defendants were not required to reimburse Thomas & Betts for response costs under § 4.  In pressing this point, Thomas & Betts contends that because

- 40 -

Acushnet Co. v. Mohasco Corp., 191 F.3d 69, 72, 76-78 (1st Cir. 1999), precludes such a de minimis defense under CERCLA, Chapter 21E must be construed to preclude such a defense as well. See John S. Boyd Co., 992 F.2d at 404 n.3.

Thomas & Betts, however, misapprehends the instruction. The instruction merely permits a court to take account of the de minimis nature of a release or threatened release in determining the equitable allocation of response costs under § 4 of Chapter 21E. Yet, Massachusetts law allows a court to do just that. See John Beaudette, Inc. v. J.P. Noonan Transp., Inc., 644 N.E.2d 218, 220-21 (Mass. 1995) (construing Chapter 21E). In fact, Acushnet itself allows a court to do the same in apportioning equitable shares of similar cleanup costs under CERCLA. 191 F.3d at 76-78 (construing CERCLA).

Thomas & Betts's briefing on appeal could be read to argue that the instruction was problematic for an additional but related reason. Thomas & Betts appears to contend that the instruction was worded in such a way as to suggest incorrectly the following: The de minimis exception applies not only to the equitable allocation of response costs among "liable" parties under § 4 but also to the threshold question of whether a "person" is "liable" pursuant to § 5 of Chapter 21E for a release or

threatened release of PCBs, such that the "person" may be "liable" under § 4 for any share at all of another's response costs.

But, Thomas & Betts did not raise such an objection to the instruction's allegedly confusing wording at the time that the instruction was given. Nor does Thomas & Betts argue on appeal that the instruction was so confusingly worded in this respect that it constituted plain error. See, e.g., Edelkind, 467 F.3d at 797; González-Mercado, 402 F.3d at 301-02. And, in any event, insofar as that is the objection that Thomas & Betts now means to make, the text of the instruction simply does not permit a reading that would give rise to this sort of confusion.

## c.

The final challenge to the District Court's denial of the motion for new trial that Thomas & Betts brings is that the jury's special verdict was inconsistent in a key respect. Our review is de novo, Trull v. Volkswagen of Am., Inc., 320 F.3d 1, 5-6 (1st Cir. 2002), but "[a] special verdict will be upheld if there is a view of the case which makes the jury's answers consistent." McIsaac v. Didriksen Fishing Corp., 809 F.2d 129, 133 (1st Cir. 1987).[11]

---

[11] The standard of review for verdict inconsistency in diversity cases is a matter of procedure and thus governed by federal law. See McIsaac, 809 F.2d at 133 (applying federal standard of review to claim of verdict inconsistency in a diversity case).

The jury found, as to Question One on the special verdict form, that New Albertson's was not "liable to" Thomas & Betts for any of its response costs. The jury found, by contrast, in response to Question Two on the special verdict form, that other parties were "liable to" New Albertson's for only 75 percent of its response costs.

Thomas & Betts contends that these findings cannot be reconciled. The parties clash over whether Thomas & Betts sufficiently preserved this challenge. They thus dispute whether it has been waived and whether, if it has not, it at least has been forfeited.

Thomas & Betts did arguably waive this objection by repeatedly asserting to the District Court, in defending the use of the verdict form, that it would be permissible for the jury to make different findings in response to Questions One and Two. See Correia v. Fitzgerald, 354 F.3d 47, 57 (1st Cir. 2003) (explaining that "failure to object to an alleged inconsistency while the jury is still in the box forfeits a party's objection, subject only to the possibility of relief for plain error."). But, even if we were to conclude that Thomas & Betts's failure to object to the verdict form merely forfeited the issue, Thomas & Betts's inconsistent-verdicts challenge would still fail.

Thomas & Betts makes no argument, after all, that any error here constituted plain error. See United States v. Zannino,

895 F.2d 1, 17 (1st Cir. 1990). We also conclude, however, that Thomas & Betts's argument would fail even if we were to treat the challenge as preserved.

The defendants' joint response contends that the jury reasonably could be understood to have found -- perfectly consistently -- two things simultaneously. The jury could have found that New Albertson's was not "liable to" Thomas & Betts, based on § 4 of Chapter 21E, for the response costs that Thomas & Betts had incurred. The jury also could have found, at the same time, that New Albertson's failed to meet its own separate burden to prove that Thomas & Betts was "liable to" it under that same section of Chapter 21E for 100 percent (rather than merely 75 percent, as the jury found) of its own response costs.

Thomas & Betts attempts to show that the jury's verdicts cannot be reconciled in this manner, but its effort to do so fails. Thomas & Betts premises this effort to demonstrate that the reconciliation of the verdicts proposed by the defendants' joint response is untenable on its reading of the SJC's decision in Martignetti v. Haigh-Farr Inc., 680 N.E.2d 1131 (Mass. 1997). Thomas & Betts points out that Martignetti states that, under § 4 of Chapter 21E, "100% of the reasonable response costs must be apportioned among the liable parties." Id. at 1141-42. Accordingly, Thomas & Betts contends, Martignetti forecloses the

reconciliation of the verdicts offered by the defendants' joint response in the following way.

Thomas & Betts argues that, because the jury allocated only 75 percent of the response costs that New Albertson's incurred to a party other than New Albertson's, the jury necessarily concluded that New Albertson's was "liable" under Chapter 21E. Otherwise, Thomas & Betts maintains, the jury could not have found Thomas & Betts "liable to" New Albertson's for less than all of its response costs. In consequence, Thomas & Betts proceeds to argue, the proposed reconciliation of the verdicts necessarily and impermissibly depends on attributing to the jury -- in violation of the passage quoted above from Martignetti -- an allocation of less than 100 percent of the response costs among the "liable" parties.

Thomas & Betts, however, misunderstands the passage in Martignetti on which it relies. In that case, the SJC construed § 4 of Chapter 21E merely to require that response costs be shared "among parties whose underlying liability to the Commonwealth is imposed by the provisions of § 5." Id. (emphasis added). In other words, Martignetti does hold that, under § 4, a party must at least be "liable to the Commonwealth" under § 5 in order to be "liable to" another party, under § 4, for the response costs that party had incurred. But, Martignetti does not hold that § 5 requires that every party who is "liable to the Commonwealth" is also

- 45 -

necessarily, under § 4, "liable" to other parties for the response costs that each of them had incurred.  Mass. Gen. Laws ch. 21E, § 5(b).  Rather, a person who is "liable to the Commonwealth" solely under § 5(a)(1), i.e., a current owner, is not liable to parties seeking reimbursement under § 4 -- unless the party seeking reimbursement is also "liable to the Commonwealth" solely under § 5(a)(1) -- if the current owner can show, per § 5(b), that it did not own the site at the time of the release in question and did not "cause or contribute" to the release.

This parsing of Martignetti matters, moreover, in the following way.  In considering this challenge to the verdicts, we "must attempt to reconcile the jury's findings, by exegesis if necessary."  Acevedo-Diaz v. Aponte, 1 F.3d 62, 74 n.15 (1st Cir. 1993) (quoting Gallick v. Baltimore & Ohio R.R. Co., 372 U.S. 108, 119 (1963)).  And, on the basis of this parsing, we conclude, consistent with Martignetti, that the jury's verdicts may be reconciled in the manner that the defendants' joint response proposes without running afoul of Chapter 21E.

Chapter 21E permitted the jury to find that New Albertson's was "liable to" the Commonwealth under § 5(a)(1) for the release or threat of release of PCBs into Mother Brook and thus incurred response costs of its own.  But, Chapter 21E did not thereby require the jury also to find that, under § 4, New Albertson's was "liable to" Thomas & Betts for any (let alone all)

of its response costs.  A party "liable to" the Commonwealth under § 5(a)(1) need not also be found, under § 4, "liable to" any other party that incurred response costs.  And, the jury could also have found, New Albertson's was entitled to reimbursement under § 4 by Thomas & Betts for the portion of the response costs New Albertson's incurred that New Albertson's could prove that Thomas & Betts owed to it, even though New Albertson's could not show under § 4 that Thomas & Betts was liable to it for all the response costs that New Albertson's had incurred.

Thomas & Betts, moreover, makes no argument that the record fails to provide adequate evidentiary support for any such findings.  And that is no surprise.  The jury found that New Albertson's did not "cause[] or contribute[] to the release of PCBs to the banks or streamed of Middle or Lower Mother Brook[.]" That is the finding that, pursuant to § 5(b), a jury has to make in order for the jury to find that a party that is "liable to" the Commonwealth under § 5(a)(1) is not, under § 4, "liable to" other parties for a share of their response costs.

We thus find no inconsistency in the verdicts.  And, having thus dispensed with the challenges that Thomas & Betts brings to the judgment concerning its claims based on § 4 of Chapter 21E, we turn to the challenges that the other parties to these consolidated appeals bring.

We start by considering the challenges brought by Alfa Laval, a centrifuge manufacturer and a past owner of the south bank property across the canal from New Albertson's property. We find no merit in them.

**A.**

The jury found that Alfa Laval, under § 4 of Chapter 21E, was "liable to" Thomas & Betts for 14 percent of its response costs but was not "liable to" New Albertson's for any of its response costs. Alfa Laval contends both that the evidence did not suffice to support the judgment that it was "liable to" Thomas & Betts under § 4 for the response costs that it had incurred and that the District Court made two reversible trial errors. We address these three arguments in turn.

**1.**

Alfa Laval unsuccessfully pressed its sufficiency challenge in both a (renewed) motion for judgment as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure and in an alternative motion for a new trial under Rule 59 of the Federal Rules of Civil Procedure. A renewed motion for judgment as a matter of law under Rule 50(b) may be granted "only if a reasonable person, on the evidence presented, could not reach the conclusion that the jury reached," and we review its denial de novo. Visible Sys. Corp. v. Unisys Corp., 551 F.3d 65, 71 (1st

Cir. 2008).  A motion for a new trial under Rule 59 may be granted only "if the verdict is against the law, against the weight of the credible evidence, or tantamount to a miscarriage of justice," and we review its denial for an abuse of discretion.  Teixeira v. Town of Coventry, 882 F.3d 13, 16 (1st Cir. 2018)(quoting Casillas-Díaz v. Palau, 463 F.3d 77, 81 (1st Cir. 2006)).

Alfa Laval contends that the evidence was insufficient for a jury reasonably to find an adequate basis for its liability under either § 5(a)(2) or § 5(a)(5) of Chapter 21E.  Thus, Alfa Laval contends, a jury could not reasonably find it liable, under § 4 of that Chapter, for an equitable share of the response costs that Thomas & Betts incurred.[12]  Because the rule in our circuit in civil cases is that a new trial that has been requested is "usually warranted" if the evidence is insufficient with respect to any one of multiple theories covered by a special verdict question, Gillespie v. Sears, Roebuck & Co., 386 F.3d 21, 29-30 (1st Cir. 2004) (quoting Kerkhof v. MCI Worldcom, Inc., 282 F.3d 44, 52 (1st Cir. 2002)), we address each of Alfa Laval's sufficiency challenges in turn.

Under § 5(a)(2), a "person" is liable both to the Commonwealth and to parties seeking reimbursement under § 4 if "at

---

[12] We note, though, that Alfa Laval does not argue that, insofar as the evidence does suffice to show that it could be allocated an equitable share of the response costs of others under § 4, the share allocated to it was too high.

the time of storage or disposal" that person "owned or operated any site at or upon which such hazardous material was stored or disposed of and from which there is or has been a release or threat of release of hazardous material." Mass. Gen. Laws ch. 21E, § 5(a)(2). Alfa Laval contends that Thomas & Betts failed to provide an adequate evidentiary basis -- as opposed to mere "conjecture or speculation" -- upon which a jury could rely to find that it "stored or used PCBs during its ownership/operation of the 1415 property."

All parties stipulated that American Tool & Machine Company ("AT&M"), which owned and operated that property before Alfa Laval purchased it, caused or contributed to a release of PCBs because of its industrial operations on that property. And, Alfa Laval contends, the PCBs on its property are attributable only to AT&M's prior operations on that site and not to Alfa Laval's own activity on that property after purchasing AT&M's business operations in 1968.

But, Thomas & Betts contends, "[l]ooking at the record as a whole[,] . . . it was eminently reasonable for a jury to conclude that Alfa Laval, which bought AT&M's tool-making operation lock, stock and barrel, also used and disposed of PCBs and is therefore liable under § 5(a)(2)." To support this contention, Thomas & Betts points to the following facts: "All of the employees, [including] the foreman and the manager for Alfa

Laval came directly from AT&M[;]" Alfa Laval manufactured the same products as AT&M; and Alfa Laval "used cutting, hydraulic and lubricating oils in the manufacture of those products, as did AT&M." Thomas & Betts further notes that Alfa Laval presented no evidence to the jury that its operations differed in any material respects from AT&M's.

We agree that, on this record, an inference of continued PCB usage was "plainly reasonable in the absence of any evidence cutting against it." W. Props. Serv. Corp. v. Shell Oil Co., 358 F.3d 678 (9th Cir. 2004); see also United States v. Davis, 261 F.3d 1, 32 (1st Cir. 2001) ("[D]irect evidence is not a prerequisite to proving the elements of liability in a contribution action [under CERCLA]."); Niagara Mohawk Power Corp. v. Chevron U.S.A., 596 F.3d 112, 131 (2d Cir. 2010) ("[T]here is nothing objectionable in basing findings [for purposes of liability in CERCLA] solely on circumstantial evidence, especially where the passage of time has made direct evidence difficult or impossible to obtain." (quoting Franklin Cty. Convention Facilities Auth. v. Am. Premier Underwriters Inc., 240 F.3d 534, 547 (6th Cir. 2001))). Thus, Alfa Laval's first challenge to the sufficiency of the evidence fails.

Moreover, Thomas & Betts contends that spreading contaminated soil during construction is properly considered "disposal" for purposes of § 5(a)(2), based in part on precedent

- 51 -

construing that term in CERCLA. See Tanglewood E. Homeowners v. Charles-Thomas, Inc., 849 F.2d 1568, 1573 (5th Cir. 1988); Bonnieview Homeowners Ass'n v. Woodmont Builders, LLC, 655 F. Supp. 2d 473, 492 (D.N.J. 2009) (finding that under CERCLA "a 'disposal' may occur when a party disperses contaminated soil during the course of grading and filling a construction site" (quoting Redwing Carriers, Inc. v. Saraland Apartments, 94 F.3d 1489, 1510 (11th Cir. 1996))). We have previously explained that "CERCLA is in many ways analogous to the Massachusetts statute," and that "the Massachusetts courts construe [Chapter 21E] in line with the federal decisions absent compelling reasons to the contrary or significant differences in the content." John S. Boyd Co., Inc. v. Bos. Gas. Co., 992 F.2d 401, 404 n.3 (1st Cir. 1993). Alfa Laval, for its part, does contest this legal point, but only in its reply brief, which it may not do.[13] See Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 299 (1st Cir. 2000).

We turn, then, to Alfa Laval's contention that the record failed to provide a supportable basis for a jury to find Alfa Laval liable under § 5(a)(2) on the basis of its construction-related

---

[13] Alfa Laval's reply brief, we note, concludes that the conduct at issue does not constitute a "disposal" for purposes of § 5(a)(2) solely on the basis of a Massachusetts Superior Court case, Byrnes v. Massachusetts Port Auth., No. 920178, 1994 WL 879644 (Mass. Super. Mar. 2, 1994), that concerned "leaking" and "leaching" of contaminants and not the kind of construction-related activities that are at issue here.

grading and excavation activities.  Thomas & Betts introduced aerial photographs of the site that showed that Alfa Laval demolished buildings, engaged in construction, graded an area to build a parking lot, and otherwise disturbed the soil on the property where significant PCB concentrations were later found. Alfa Laval responds that Thomas & Betts's expert impermissibly provided "speculation, conjecture and generalization" in claiming that these activities caused releases of PCBs into Mother Brook.

But, a jury could have drawn a reasonable inference that "[t]he amount of earthwork and [] disturbance of the soil" and the undisputed fact that Alfa Laval "removed certain improvements from the property[] and added a new building and parking surface" showed that there was a release of PCBs from the property into Mother Brook during Alfa Laval's period of ownership and thus that Alfa Laval was liable under § 5(a)(2).  See Davis, 261 F.3d at 32; Niagara Mohawk Power Corp., 596 F.3d at 131.  Thus, we conclude that the concerns that Alfa Laval raises about Thomas & Betts's expert's testimony go only to the "weight, not sufficiency," of the evidence.  See Milone v. Moceri Family, Inc., 847 F.2d 35, 40 n.5 (1st Cir. 1988).  Accordingly, we reject Alfa Laval's challenge

that a reasonable jury could not have found it liable under § 5(a)(2).[14]

Alfa Laval separately contends that there was insufficient evidence for a jury to find that it was liable to Thomas & Betts under § 5(a)(5). That provision imposes liability to the Commonwealth and to parties seeking reimbursement under § 4 on "any person who otherwise caused or is legally responsible for a release or threat of release of oil or hazardous material from a . . . site." Mass. Gen. Laws ch. 21E, § 5(a)(5). Alfa Laval correctly contends that, to prevail on a § 5(a)(5) theory of liability, "a plaintiff must first establish both that the defendant caused the release and that the release caused the contamination." And, Alfa Laval notes, "cause" in this context "means legal or proximate cause." One Wheeler Rd. Assocs. v. Foxboro Co., No. 90-12873, 1995 WL 791937, at *8 (D. Mass. Dec. 13, 1995).

Alfa Laval argues that this standard of liability is "higher than that applied to § 5(a)(2)." Thus, for the same

---

[14] To the extent Alfa Laval is making the separate argument that the release of PCBs from its property was not a "but for" cause of the contamination and thus that it is not "liable" under § 5(a)(5) of Chapter 21E, this challenge also fails. Alfa Laval points to testimony from Dr. Neil Shifrin to show that the contamination from Thomas & Betts's property was "more than sufficient" to cause the contamination in Mother Brook. But this is merely another form of a de minimis defense to liability under § 5, which is expressly foreclosed by Acushnet. 191 F.3d at 71.

- 54 -

reasons that it contends that Thomas & Betts failed to prove § 5(a)(2) liability, Alfa Laval argues that Thomas & Betts also falls short on this theory as well.

Alfa Laval's only argument that Thomas & Betts failed to provide sufficient evidence of liability under § 5(a)(5), however, is that Thomas & Betts failed to provide adequate evidence of causation of a release. But, as we have already explained, a reasonable jury could have found that Alfa Laval's industrial operations on the site involved the active use, storage, and disposal of PCBs and that releases of PCBs occurred at this time. And, as we also have already explained, a jury could additionally have concluded that construction-related activities by Alfa Laval on the site further caused releases of PCBs.

Moreover, Alfa Laval makes no argument -- aside from merely pointing out that the legal standard for liability is higher under § 5(a)(5) than it is under § 5(a)(2) -- that, even if a jury could reasonably have found these facts and imposed liability pursuant to § 5(a)(2), these actions by Alfa Laval do not suffice also to show § 5(a)(5) liability. Thus, we fail to see why a reasonable jury could not conclude that Alfa Laval "legal[ly] or proximate[ly] caused," One Wheeler Rd. Assocs., 1995 WL 791937, at *8, a release of PCBs into Mother Brook based on its industrial and construction activities. Accordingly, we reject Alfa Laval's challenge to the verdict on sufficiency grounds.

Having rejected the challenges to the sufficiency of the evidence of liability under § 5, such that Alfa Laval could be found "liable to" Thomas & Betts under § 4, we now turn to Alfa Laval's challenges to certain alleged trial errors.  The first challenge is to the District Court's denial of Alfa Laval's motion for a new trial because of an instructional error that it contends that the District Court made during its charge to the jury.  The instruction concerned Alfa Laval's potential liability under § 4 to Thomas & Betts for reimbursement of its response costs based on Alfa Laval being the alleged successor to a company -- AT&M -- that previously owned the site.

The District Court instructed the jury that "Thomas & Betts has to prove what's called 'successor liability'" and that the jury should consider four factors in deciding whether Thomas & Betts has proven such.  The District Court then listed the four factors that must be considered with respect to this de-facto-merger exception to the default no-liability rule.  After doing so, the District Court also told the jury that:  "No single one factor is necessary or sufficient, you must determine the substance of the agreement of the parties, is it implicit that Alfa Laval would succeed to the legal obligations of [AT&M]?"

Alfa Laval objected to this instruction on the ground that the District Court had not "talked about the general rule

that there is no liability and that there has to be an element of proof proving up an exception." The District Court overruled that objection, and Alfa Laval now presses that same challenge to the instruction on appeal.[15]

We review de novo whether a jury instruction in context "presented the relevant issues to the jury fairly and adequately." Goodman, 380 F.3d at 47. Here, however, the District Court plainly instructed the jury that "Thomas & Betts <u>has to prove</u> what's called 'successor liability.'" But, because "judges generally need not mimic the precise wording of a party's preferred instruction," <u>United States</u> v. <u>Denson</u>, 689 F.3d 21, 26 (1st Cir. 2012), we reject Alfa Laval's challenge to this jury instruction.

### 3.

Alfa Laval's challenge to the other asserted trial error concerns the District Court's exclusion of certain testimony by an expert witness, James O'Brien. Alfa Laval did not make this

---

[15] Alfa Laval also contends on appeal that the District Court erred by not instructing the jury regarding the other exceptions -- beyond the exception for a de-facto merger -- to the default no-liability rule. We agree with Thomas & Betts, however, that Alfa Laval did not preserve this issue below. Nor does Alfa Laval make a plain error argument. See Chestnut v. City of Lowell, 305 F.3d 18, 20 (1st Cir. 2002) (describing the plain error test). In any event, we fail to see how Alfa Laval could have been prejudiced by an instruction that minimized the grounds on which Alfa Laval could be found liable. See Goodman, 380 F.3d at 47 (explaining that instructional error warrants a new trial only upon a showing of prejudice).

challenge before the District Court in either its motion for a new trial or in its motion for judgment as a matter of law. Thomas & Betts, however, makes no argument that our review should thus be for plain error, let alone that the issue is waived. In any event, we conclude that Alfa Laval fails even under the more generous abuse of discretion standard that we apply when reviewing a District Court's decision to exclude expert testimony. Wilder v. Eberhart, 977 F.2d 673, 676 (1st Cir. 1992).[16]

At trial, O'Brien attempted to testify as to the likelihood that PCBs flowed from Alfa Laval's property to the south bank on the basis of "total PCB" data. Thomas & Betts objected to this testimony on the basis that it constituted a "new opinion." The District Court sustained this objection. See Poulis-Minott v. Smith, 388 F.3d 354, 358 (1st Cir. 2004) (explaining that the failure to disclose an expert opinion before trial precludes the introduction of that opinion at trial), and O'Brien was prevented from testifying about that opinion at trial.

---

[16] Alfa Laval separately contends that the District Court's failure to rule comprehensively on Thomas & Betts's pretrial motion to exclude reference, including by O'Brien, to so-called Aroclor data was an abdication of the District Court's gatekeeping role. Aroclor data differentiates between types of PCBs. Yet Alfa Laval cites no authority to support its contention that the District Court's ruling on the presentation of the Aroclor data on an expert-by-expert basis constitutes an abdication of this gatekeeping role. Accordingly, this challenge is waived for lack of development. Zannino, 895 F.2d at 17.

Alfa Laval now contends on appeal that the District Court erred because O'Brien's pre-trial expert report itself referenced "total PCB [] data" that were available for various sediment samples. Thus, Alfa Laval contends, the proposed testimony that the District Court barred O'Brien from giving did not constitute a new opinion because the pre-trial report had already disclosed it.

O'Brien did not reach any conclusions, however, in his pre-trial report on the basis of total PCB data. Nor did he disclose in that report -- or elsewhere -- the methodology by which he would reach any such conclusions. Thus, the mere fact that O'Brien's pre-trial report disclosed that he had reviewed total PCB data did not preclude the District Court from finding, in its discretion, that the opinions and conclusions that he drew from that data were "new" and thus inadmissible because they were not previously disclosed. See Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997) (finding that district courts do not abuse their discretion when they decline to admit opinion evidence that "is connected to existing data only by the ipse dixit of the expert" or where there is "simply too great an analytical gap between the data and the opinion proffered"); see also Licciardi v. TIG Ins. Grp., 140 F.3d 357, 363 (1st Cir. 1998) (explaining that the disclosure requirements regarding expert opinions are intended "to alleviate the heavy burden placed on a cross-examiner confronted

by an opponent's expert whose testimony had just been revealed for the first time in open court" (internal quotations omitted)).

**IV.**

We now turn to the appeal by the Charter School Parties. The jury found the Charter School Parties "liable to" Thomas & Betts, with respect to its claims based on § 4 of Chapter 21E, for 1 percent of the response costs that it had incurred. The District Court entered judgment against the Charter School Parties on that basis. The Charter School Parties challenge the District Court's denial of its renewed motion for judgment as a matter of law. They argued in that motion that the evidence was insufficient as a matter of law to support a finding that they were "liable to" Thomas & Betts under § 4 of Chapter 21E for any of its response costs, and that, to the extent that they were liable, the evidence did not suffice to support the finding that they were responsible for 1 percent of the response costs, small though that allocation is. See Fed. R. Civ. P. 50(b). Accordingly, they contend that because there is insufficient evidence on any of the theories to support the judgment below, they are entitled to judgment as a matter of law. Judgment as a matter of law is warranted only if the evidence "is so one-sided that the movant is plainly entitled to judgment" such that "reasonable minds could not differ as to the outcome." Gibson v. City of Cranston, 37 F.3d 731, 735 (1st

Cir. 1994). Our review of the District Court's denial of such a motion is de novo. See Visible Sys., 551 F.3d at 71.

**A.**

It is true, as the Charter School Parties point out, that they did not become the owners of the south bank property abutting Mother Brook until September of 2008. But, contrary to the Charter School Parties' contention, Thomas & Betts offered sufficient evidence from which the jury could have reasonably found that, after the Charter School Parties acquired the south bank property in 2008, there was a "release or threat of release" from or at that property. Mass. Gen. Laws ch. 21E, § 5(a)(1). Thus, a jury could reasonably find that the Charter School Parties were "liable to" Thomas & Betts for at least some portion of its response costs under § 4, as the jury could have found that, under § 5(a)(1), the Charter School Parties were "liable" for a "release or threat of release" of PCBs as a current owner of a property. Id.

In arguing otherwise, the Charter School Parties devote a great deal of time and attention to what the evidence showed about a single drain basin, discovered on its property in 2009. They contend that this evidence alone does not permit a jury reasonably to find that there had been a release or threat of release of PCBs into Mother Brook at all during their period of ownership of the property. The Charter School Parties emphasize

- 61 -

that the evidence of the amount of PCBs traceable to that basin was simply too miniscule to support any such finding. Thus, the Charter School Parties contend that they fall within the exception found in § 5(b). That exception provides that parties whose liability under § 5 is premised on § 5(a)(1) are liable only to the Commonwealth -- and thus not to other parties in a § 4 reimbursement suit -- if the release occurred prior to their period of ownership and they did not "cause or contribute" to the release or threat of release in question. Id. § 5(b).

But, even if we accept that point about the drain basin evidence, there is still the testimony of an expert for Thomas & Betts, Dr. David Langseth. He testified that the PCBs lurking in the Charter School Parties' soil were carried into Mother Brook by surface runoff and thus that there was a release of PCBs into Mother Brook from the Charter School Parties' property during their period of ownership of it.

The Charter School Parties do attempt to address this testimony. They argue that Langseth testified that any PCBs on their soil were "at depth" -- i.e., located only very deep in the soil -- and thus could not be mobilized by surface runoff or erosion.

But, Langseth also testified that there were PCBs at the surface level. Indeed, the jury heard testimony and saw evidence

of significant concentrations of PCBs at the surface level of the Charter School Parties' property as late as October of 2009.

Thus, the jury could reasonably find that there were high concentrations of PCBs in the topsoil on the property during the relevant period. Such a finding would be significant. Langseth testified that surface runoff carries soil and PCB particles with it, and that, in consequence of the slope of the property, all rainfall -- and thus all surface runoff from the property -- would end up in Mother Brook.

The Charter School Parties further argue in response that Langseth's testimony is too "speculative." They contend that his testimony focused primarily on features of the property -- such as its slope and the extent of paved surfaces -- that long predated their ownership of that property. And, the Charter School Parties contend, there were significant changes to the property, including the addition of paved surfaces that would prevent runoff and the construction of a barrier to prevent erosion from the property into Mother Brook, in the years leading up to the Charter School Parties' purchase.

The Charter School Parties overlook the fact, however, that the jury received evidence that showed that not all of the property was paved during the time that they owned it and that the portions of the property that were not paved included portions with the highest concentration of PCBs, which were located closest

to Mother Brook. Moreover, Dr. Mark Tompkins, an expert for another defendant, testified that while the protective barrier along the streambed would have helped prevent erosion of contaminated soil into Mother Brook, there were "unprotected area[s]" on the property from which PCBs "could be mobilized and transported over the [barrier]."

Thus, we agree with Thomas & Betts that a reasonable jury could have found, based on the evidence, that there were high levels of PCBs in the surface-level soil at the time the Charter School Parties owned the property, that some portions of the contaminated areas of that property were unpaved at that time, and that all runoff from the property goes to Mother Brook. We thus agree with Thomas & Betts that a jury supportably could have found that the Charter School Parties were liable under § 5(a)(1) based on a release or threat of release of PCBs that occurred after they acquired the property. And, therefore, the jury was entitled to find, under § 4, that the Charter School Parties were "liable to" Thomas & Betts for an equitable share of its response costs.

Separately, the jury also could have based that same finding on still other evidence in the record. Specifically, the jury could have found that the Charter School Parties' construction projects on the property led to soil disruption and thus a release of PCBs into Mother Brook. In particular, the jury received evidence that showed both that there was significant construction

on the Charter School Parties' property near Mother Brook after the Charter School Parties acquired the property and that the construction had to be halted because of the presence of PCBs. In fact, the record contains evidence of correspondence between the Charter School Parties' project management company and construction company, in which the construction company wrote "[o]n September 2, 2009 we received notice from your office to halt the work on the north side . . . of the [Charter School] site due to the detection of PCB[s]." Therefore, a jury could supportably find that there were construction activities on the property that led to a release of PCBs during the Charter School Parties' period of ownership and, thus, that the Charter School Parties must reimburse Thomas & Betts for response costs. See Mass. Gen. Laws ch. 21E, §§ 4, 5(a)(1).

In their reply brief, the Charter School Parties make one additional argument about why, under § 4, they cannot be found "liable to" Thomas & Betts for the response costs that they incurred. They contend that any release or threat of release of PCBs that a jury could supportably have found to have occurred on the property during the time that the Charter School Parties owned it occurred after the MassDEP directed Thomas & Betts to remediate Mother Brook (albeit before Thomas & Betts completed the remediation). And, the Charter School Parties contend, any release

or threat of release at that point is not one that may make them liable to reimburse Thomas & Betts for its response costs.

The Charter School Parties rely for this argument on § 5(b) of Chapter 21E. That provision states, in pertinent part, that a current owner "who did not own or operate the site at the time of the release . . . in question and did not cause or contribute to such release" may not be liable under Chapter 21E. Mass. Gen. Laws ch. 21E, § 5(b). The Charter School Parties contend that "the release . . . in question" is necessarily the release of PCBs that the MassDEP directed Thomas & Betts to remediate, as opposed to the "release" from or at the Charter School Parties' site to which the immediately preceding section refers. See id. § 5(a). And, the Charter School Parties contend, because the MassDEP directed that remediation before they purchased the south bank property in 2008, they "did not own or operate the site at the time of the release . . . in question" and are not "liable to" a "person," such as Thomas & Betts, seeking reimbursement under § 4 of Chapter 21E. Id. § 5(b).

The Charter School Parties did not, however, make this argument either to the District Court or in its opening brief to us. And, "[w]e have held, with a regularity bordering on the monotonous, that issues advanced for the first time in an appellant's reply brief are deemed waived." Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 299 (1st Cir. 2000). That rule,

moreover, is especially applicable here.  The Charter School Parties appeared to take a contrary position in their opening brief about the import of the phrase "release . . . in question" than the one that they advance for the first time in their reply brief. In their opening brief, they conceded that "the jury could have found [them] liable if there was evidence that [they] 'caused' or 'contributed to' a release of PCBs to the banks or streamed of Mother Brook <u>after</u> [they] bought the property."  (emphasis added).

**B.**

In their appeal from the District Court's denial of their motion for a judgment as a matter of law, the Charter School Parties also contend the following.  They argue that, even if the evidence sufficed to support a finding that they were "liable" for a release or threat of release of PCBs under § 5 of Chapter 21E, the jury's verdict that, under § 4, they were "liable to" Thomas & Betts for 1 percent of the response costs that it had incurred is not supportable.  They contend that the evidence simply did not suffice to support the jury's determination that there was enough of a "causal link,"  <u>John Beaudette</u>, 644 N.E.2d at 220 (quoting <u>Providence & Worcester R.R.</u> v. <u>Chevron U.S.A., Inc.</u>, 622 N.E.2d 262, 264 (Mass. 1993)), between a release or threat of release from their property after they purchased it and the response costs incurred by Thomas & Betts to justify an allocation under § 4 of even 1 percent of those response costs to them.  <u>Id.</u> at 220-21.

Thus, they contend, Thomas & Betts was not entitled to have them reimburse it for that share (small though it is) of those costs. Id. at 220-21; see Acushnet 191 F.3d at 78. Accordingly, the Charter School Parties contend that they are entitled to judgment as a matter of law for this reason, too.

In support of this aspect of the Charter School Parties' challenge, the Charter School Parties first argue that they should not be liable to Thomas & Betts for any share of response costs under § 4 incurred by Thomas & Betts as a result of PCBs released from their property prior to the Charter School Parties possession of the property. But, this argument is beside the point, given our conclusion that the jury could supportably find that there were releases from that property following the point in time at which the Charter School Parties owned the property.

The Charter School Parties also argue that the release caused by the drain pipe is too minimal to justify allocation of any response costs to the Charter School Parties, let alone 1 percent of them. But, as we have already explained, a jury could supportably find on the basis of other evidence the Charter School Parties liable to Thomas & Betts under § 4 of Chapter 21E for an equitable share of its response costs because of a release or threat of release from their property during the time that they owned or operated it. And the Charter School Parties make no

argument that an allocation of 1 percent of the response costs, if based on that evidence, cannot be sustained.

## V.

We next turn to the challenge that Thomas & Betts brings to the portion of the District Court's judgment that awarded prejudgment interest to New Albertson's on the amount that Thomas & Betts was found liable to pay it pursuant to Chapter 21E.  New Albertson's moved, over Thomas & Betts's objection, to amend the initial judgment on the verdict to include the roughly $2.9 million that it had already paid pursuant to the joint remediation agreement and for an award of prejudgment interest on that amount pursuant to § 6B or § 6H of Chapter 231.  The District Court then granted the motion and awarded prejudgment interest to New Albertson's on the amount that included the roughly $2.9 million. "We review an award of prejudgment interest for abuse of discretion, . . . but legal issues relating to the prejudgment interest award are reviewed de novo."  Analysis Grp., Inc. v. Central Florida Invs., Inc., 629 F.3d 18, 24 (1st Cir. 2010).

Thomas & Betts contends that it was legal error to award prejudgment interest "based on an arbitrary interpretation of the provisions of the Joint Response Agreement."  Specifically, Thomas & Betts argues that "[w]hile the Joint Response Agreement reserves each party's claims to 'recover its costs,'" including the reallocation of the roughly $2.9 million dollars previously paid

by New Albertson's to Thomas & Betts, the terms of the Joint Response Agreement "d[id] not provide for interest on the recovered amount."

But, the District Court did not base the award of prejudgment interest on the terms of the agreement. The District Court entered judgment "in favor of [New Albertson's] against [Thomas & Betts] in the amount of $3,517,855.61, computed as the sum of $593,548.73 awarded by the jury's verdict plus $2,924,306.88 that all parties have stipulated [New Albertson's] paid [Thomas & Betts] on an interim basis under those parties' November 8, 2007 'Mother Brook Stream Bank Remediation / Stabilization Agreement' . . . ." The District Court then awarded prejudgment interest on the entire amount pursuant to either § 6B or § 6H of Chapter 231, as each makes clear that prejudgment interest "shall be added" in certain kinds of cases. Mass. Gen. Laws ch. 231, §§ 6B, 6H.

Notably, Thomas & Betts does not dispute that funds awarded in a judgment based on § 4 of Chapter 21E for "response costs" qualify as funds for which prejudgment interest "shall be added" under § 6B or § 6H of Chapter 231. Thus, we fail to see how, in light of the text of the District Court's judgment, the roughly $2.9 million awarded to New Albertson's is not an amount that is subject to these statutory provisions regarding the adding on of prejudgment interest.

- 70 -

Consistent with this conclusion, we note that the very terms of the stipulation that the District Court references as the basis for including the roughly $2.9 million in the judgment is the fact that "New Albertson[']s reimbursed Thomas & Betts $2,924,306.88 for response costs incurred in the remediation of the banks of Middle Mother Brook." We note, too, that Thomas & Betts does not develop any argument that, under the joint remediation agreement, even if prejudgment interest must be added on to the roughly $2.9 million referenced in the judgment pursuant to § 6B or § 6H, New Albertson's somehow contractually relinquished its right to obtain those funds.

For these reasons, we reject the contention by Thomas & Betts that the District Court's award of prejudgment interest on the response costs awarded in the judgment constitutes legal error. We thus turn to the only remaining issues, which concern the District Court's judgment awarding attorney's fees under Chapter 21E.

## VI.

Section 15 of Chapter 21E allows an award of "costs, including reasonable attorney and expert witness fees, to any party who advances the purposes of this chapter." Mass. Gen. Laws ch. 21E, § 15.[17] New Albertson's requested attorney's fees pursuant

---

[17] The provision provides in full:

to this section.  Over Thomas & Betts's objection, the District Court entered a judgment in favor of New Albertson's and against Thomas & Betts in the amount of $1,747,188.59 for costs, including reasonable attorney and expert witness fees.

Both parties have appealed that ruling.  The challenge to the award of attorney's fees raises a question of Massachusetts law.  Peckham v. Cont'l Cas. Ins. Co., 895 F.2d 830, 841 (1st Cir. 1990).  We review the District Court's award determination "only for a mistake of law or abuse of discretion."  Heien v. Archstone, 837 F.3d 97, 100 (1st Cir. 2016) (reviewing the award of attorney's fees in a diversity case applying Massachusetts law).

**A.**

Thomas & Betts challenges the attorney's fees award to New Albertson's on the ground that New Albertson's is not entitled to attorney's fees under § 15 of Chapter 21E because it is not a party "who advance[d] the purposes of this chapter."  Mass. Gen.

---

In any suit by Massachusetts residents to enforce the requirements of this chapter, or to abate a hazard related to oil or hazardous materials in the environment, the court may award costs, including reasonable attorney and expert witness fees, to any party other than the commonwealth who advances the purposes of this chapter.

Mass. Gen. Laws ch. 21E, § 15.

Laws ch. 21E, § 15.[18]  Thomas & Betts asserts that the SJC's precedents establish a "two part test" under § 15 to determine whether a party advanced the purposes of Chapter 21E. Specifically, Thomas & Betts contends, "even if the equitable allocation [to the party seeking to recover attorney's fees] is zero, [that party] must also be found not to have caused or contributed to a release in order to recover fees."  Thomas & Betts therefore argues that New Albertson's did not advance the purposes of Chapter 21E because the jury found New Albertson's equitably responsible for 25 percent of its own response costs.

But, in the SJC's most recent decision on § 15, Bank, the SJC expressly stated that "[a]ll that [Mass Gen. Laws ch.] 21E, § 15, requires is that a plaintiff has sought reimbursement under [Mass Gen. Laws ch.] 21E, § 4, and has not contributed to the hazardous waste release."  888 N.E.2d at 921.  And, while Thomas & Betts is correct that the plaintiffs who won an attorney's fees award in Bank were not found responsible for any equitable share of the response costs incurred in the cleanup, Bank did not

---

[18] Thomas & Betts contends in the alternative that, even if New Albertson's may recover fees under Chapter 21E, the liability for the fees should have been allocated severally among Thomas & Betts and the other two parties found "liable to" Thomas & Betts under § 4 of Chapter 21E for portions of its response costs (albeit not New Albertson's) -- that is, Alfa Laval and the Charter School Parties.  As the District Court correctly pointed out, however, the problem with this argument is that neither Alfa Laval nor the Charter School Parties were found "liable to" New Albertson's in the action that New Albertson's brought under § 4 of Chapter 21E.

rely on that fact to determine which parties could recover the fees.  See id. at 905.

Moreover, Bank relied on Martignetti.  The SJC explained there that "a party which has not contributed to, or caused, the release of hazardous materials necessitating its response actions can 'advance[] the purposes' of [Mass. Gen. Laws ch.] 21E by bringing a § 4 claim, and therefore only such a party may be awarded attorney's fees and costs under § 15."  Martignetti, 680 N.E.2d at 1148 (alteration in original); see also id. at 1148 n.42.[19]  Notably, Martignetti did not state that a party was precluded from obtaining fees if it incurred response costs of its own that were not fully reimbursed.

We note as well that Martignetti drew upon Sanitoy v. Ilco Unican Corp., 602 N.E.2d 193, 197 (Mass. 1992), which involved facts quite similar to those presented by this appeal.  There, the SJC allowed a plaintiff to recover attorney's fees under § 15 of Chapter 21E, even though the jury did not award the plaintiff 100 percent of its response costs for which it sought reimbursement under § 4.  The jury had found the defendant "wholly responsible

---

[19] We need not address whether a "person" who did not "cause or contribute" to the release within the meaning of § 5(b) of Chapter 21E, but nevertheless owned the property at the time of the release and thus is "liable to" both the Commonwealth and a "person" seeking reimbursement for response costs under § 4, see Mass. Gen. Laws ch. 21E, § 5(b), would be considered to have "advanced the purposes" of Chapter 21E.  Id. § 15.

for the contamination on the portion of the site it had previously owned," and the jury awarded the plaintiff its response costs incurred in cleaning up that portion of the site.  Martignetti, 680 N.E.2d at 1147.  But, the plaintiff had incurred additional response costs for cleaning up other portions of the site for which it was not reimbursed (and for which the record did not indicate that it was causally responsible for the contamination).  Id.  The SJC nevertheless held that the plaintiff was entitled to "the full amount" of its attorney's fees.  Sanitoy, 602 N.E.2d at 197.[20]

Thomas & Betts does point to a passage in Martignetti in order to support its position.  In that passage, the SJC, upon vacating a Chapter 21E verdict and remanding the case, concluded that "if, in a new trial, the plaintiffs are found to be liable for an equitable share of the response costs, they will not be entitled to an award of attorney's fees and costs under § 15." 680 N.E.2d at 1147.  Thomas & Betts asserts that this passage shows the following: Any plaintiff that does not fully recover its response costs -- and thus that must pay for at least some of them in a Chapter 21E reimbursement action based on § 4 -- may not

---

[20] Thomas & Betts does point out that the plaintiff in Sanitoy was not found liable for an equitable share of response costs under § 4 of Chapter 21E with respect to the defendant's portion of the contaminated site for which it was awarded response costs and attorney's fees.  See 602 N.E.2d at 197.  However, Thomas & Betts does not explain how that fact bore on the SJC's fees analysis, nor do we see how it did.

recover attorney's fees, even if the jury finds that the plaintiff did not cause or contribute to a release of hazardous material.

But, as we have already explained, under Martignetti, and in consequence of § 5(b) of Chapter 21E, a "person" may be "liable to the Commonwealth" by virtue of § 5(a)(1) but not "liable to" others under § 4 of Chapter 21E. That is only the case, though, if that "person" neither owned the property at the time of the release (or threat of release) nor "caused or contributed" to the release (or threat of release) in question. Mass. Gen. Laws ch. 21E, § 5(b). And so the phrase in Martignetti "liable for an equitable share," 680 N.E.2d at 1147 (emphasis added) -- which comes straight from § 4 itself -- is, in context, best read as follows. The phrase is merely a reference to whether, for purposes of § 5(b), the plaintiffs there had "caused or contributed" to a release of hazardous material, such that they were "liable" under § 4 of Chapter 21E to other parties to reimburse them for their response costs.

This understanding is further bolstered by another portion of Martignetti. There, the SJC explained that only a plaintiff that "has not contributed to, or caused, the release of hazardous materials necessitating its response actions can 'advance[] the purposes' of [Mass. Gen. Laws ch.] 21E by bringing a § 4 claim, and therefore only such a party may be awarded

attorney's fees and costs under § 15." 680 N.E.2d at 1148 (alteration in original).

Thus, we conclude that New Albertson's was entitled to attorney's fees from Thomas & Betts because New Albertson's "has sought reimbursement under [Mass. Gen. Laws ch.] 21E, § 4, and has not contributed to the hazardous waste release." Bank, 888 N.E.2d at 921. Accordingly, we move on to the challenge that New Albertson's makes to the District Court judgment awarding it costs, including attorney's fees.

**B.**

The sole challenge that New Albertson's makes to the fees award concerns its amount. In order to understand the nature of its challenge, some additional background on the work done by its attorneys is helpful.

The law firm that represented New Albertson's below, Sugarman, Rogers, Barshak & Cohen, also represented three other parties related to the supermarket at the north bank property. The District Court concluded that the supermarket parties were not "so similarly situated that this case falls into the 'multiple interrelated claims' category." Thus, the District Court concluded that New Albertson's could only recover fees for the work its counsel did for its benefit and not for the benefit of the other supermarket parties.

New Albertson's identified 89 out of 5,469 billing entries that did not involve work for New Albertson's. But, the District Court found that some other billing entries corresponded to work performed "not solely for New Albertsons's benefit (and in some cases, not for its benefit at all)." Moreover, the District Court found, New Albertson's had not provided a "meaningful way of differentiating those entries to which New Albertson[']s has already applied a discount from various others on which it seeks to recoup 100 percent" -- which the District Court attributed to Sugarman Rogers's "purposeful" "failure to keep more detailed records." Accordingly, the District Court adopted a "keyword search methodology," which was proposed in an affidavit by Thomas & Betts's attorney, Howard Merten, so that the District Court could identify billing entries that corresponded to work done for multiple parties.

The District Court then discounted the fees awarded based on these entries to reflect the fact that the work was not done solely on behalf of New Albertson's. As for how much to discount those entries, the District Court found the method proposed by New Albertson's involving "a range of discount percentages" based on an "individualized" assessment of the various billing entries to be "so opaque as to preclude effective review." The District Court therefore adopted Thomas & Betts's proposed pro-rata discount of 75 percent.

The parties next submitted motions for the entry of judgment for fees based on competing keyword lists. The District Court then issued a written decision determining which proposed keywords would be accepted or rejected, with an explanation for each proposed keyword.

New Albertson's asserts that the District Court erred in several ways. First, New Albertson's contends that the District Court erred by not addressing whether the work attributable to the multiple supermarket parties was nevertheless compensable because it would have been appropriate for that work to have been done for New Albertson's alone. Second, New Albertson's alleges that the 75 percent discount rate was arbitrary insofar as this rate does not correspond to the relative litigation interests and risk of the four supermarket parties. Finally, New Albertson's contends that the keywords used to identify entries for discounting (such as "discovery" and "expert") were overbroad.[21]

As the party seeking the award of attorney's fees, New Albertson's "bear[s] the burden of producing the necessary evidence" for it. Bank, 888 N.E.2d at 920. We review for abuse of discretion. See Sanitoy, 602 N.E.2d at 197. We see none.

---

[21] New Albertson's also contends that the District Court erred by effectively requiring "separate billing accounts for each of the four Supermarket Parties." However, the record does not show that the District Court required such.

We start with New Albertson's argument that the District Court failed to address whether the billed work was appropriate to have been done for New Albertson's alone. But, the District Court did address -- and reject -- that argument. The District Court explained in its September 29, 2016 order that, "[a]s is clear from New Albertson[']s's decision to remove certain billing entries from its fee motion and to reduce others by some percentage, not all of the work performed by Sugarman Rogers in connection with this case served New Albertson[']s exclusively or at all." Yet, the District Court went on to explain, "the Court has no meaningful way of differentiating those entries to which New Albertson[']s has already applied a discount from various others on which it seeks to recoup 100 percent." New Albertson's does not explain how such a determination represented an abuse of the District Court's considerable discretion to determine fee awards.

In addition, the District Court explained that it was "not convinced that each [supermarket] party is so similarly situated that this case falls into the 'multiple interrelated claims' category." New Albertson's has not persuasively explained, however, why the District Court was wrong on that score, especially given the distinct facts and theories of liability that corresponded to the various supermarket parties. For example, two of the supermarket parties were sued as prior owners of the

supermarket property during the 1970s through 1990s, whereas New Albertson's stood in the shoes of a current owner and operator as of the 2000s.

Finally, as for the arguments that New Albertson's makes regarding the discount rate and keyword methodology, the District Court explained that it adopted these methods because it determined that New Albertson's had not put forth records that allowed for better alternatives. And, we note, the District Court undertook an exhaustive evaluation of each keyword proposed by both parties in its second written decision on attorney's fees on March 10, 2017. Accordingly, we conclude that New Albertson's has not shown that the District Court's fees award was an abuse of discretion.[22]

## VII.

The contamination of Mother Brook precipitated an extensive cleanup operation. So, too, did the litigation that followed. We **affirm** the District Court's judgment in Nos. 16-1133, 16-1134, 16-1189, 17-1360, and 17-1361. And we **dismiss** No. 16-1204 as moot.

---

[22] New Albertson's also argues that it is entitled under § 15 to fees and costs related to this appeal. We deny its request without prejudice to its filing an attorney's fee application in accordance with our normal procedure set forth in Local Rule 39.1(b) of the First Circuit Court of Appeals.